**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

PROPERTY OWNERS WITHSTANDING
ETJ RETRACTIONS; and THE
SCHOENSTATT MOVEMENT OF
AUSTIN,

    *Plaintiffs,*

v.

CITY OF AUSTIN; T.C. BROADNAX, *in his
official capacity* as City Manager; and KEITH
MARS, *in his official capacity* as Director of
Development Services Department,

    *Defendants.*

Civil Action No. 1:26-cv-1518

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The City of Austin (the "City") asserted jurisdiction it does not have to claim authority over private land that had already been released from its regulatory grasp—all without a word of notice or any opportunity to be heard.

Between 2023 and early 2026, the City formally released approximately 170 properties located within five miles of Bee Caves Armory from its extraterritorial jurisdiction ("ETJ"). Then, in March 2026, without a word of warning, the City declared it had changed its mind and that the properties were immediately back in the City's ETJ and subject to its regulatory authority.

This unauthorized municipal takeover has halted expansion projects, destroyed pending property transactions, and subjected property owners outside the City's borders to the very land-use controls the Texas Legislature gave them the right to escape. It is a violation of the U.S. and Texas Constitutions. It is a direct attack on fundamental property rights and the rule of law. It demands immediate relief.

## JURISDICTION AND VENUE

1.      This is a civil rights suit brought under the Fifth and Fourteenth Amendments to the U.S. Constitution and the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983, seeking declaratory and injunctive relief.

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202 and 42 U.S.C. § 1983. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this district under 28 U.S.C. § 1391 because the City resides in this district and a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

4.      Plaintiff Property Owners Withstanding ETJ Retractions ("POWER") is a Texas nonprofit corporation in good standing. POWER was formed on April 8, 2026 (Texas Secretary of State File No. 806548296) for the purpose of vindicating the statutory and constitutional rights of property owners whose properties were released from the City's ETJ under Chapter 42 of the Texas Local Government Code and whose releases the City has now purported to rescind. POWER's membership includes property owners similarly affected by the City's March 2026 retraction. POWER's purpose includes obtaining declaratory and injunctive relief to prohibit the City from asserting jurisdiction it does not lawfully possess.

5.      Plaintiff The Schoenstatt Movement of Austin ("Schoenstatt") is a Texas nonprofit religious organization that serves the Catholic diocese in the greater Austin area. Schoenstatt is the owner of real property in Travis County, Texas, identified as: (i) ABS 626 SUR 37 PERKINS I ACR 5.690 (Addie Roy Road); (ii) LOT 5 BLK A ROB ROY ON THE LAKE SEC 1 (105 N. Weston Lane); (iii) LOT 6 BLK A ROB ROY ON THE LAKE SEC 1 (107 N. Weston

2

Lane); and (iv) ABS 626 SUR 37 PERKINS I ACR 17.665 (225 Addie Roy Road), each of which was released from the City's ETJ pursuant to Chapter 42 of the Texas Local Government Code.

6.    Defendant City of Austin is a Texas home-rule municipality incorporated in Travis County, Texas. Since 2023, the City has released approximately 170 properties located within five miles of Bee Caves Armory from its ETJ pursuant to Chapter 42 of the Texas Local Government Code, expressly determining that those properties satisfied the statutory requirements for mandatory release. The City now claims to have made a redetermination, retracting its releases and reasserting regulatory authority over those properties, including the Plaintiffs' properties.

7.    Defendant T.C. Broadnax is the City Manager of the City of Austin and is sued in his official capacity. As the City's chief administrative officer, he holds final authority over the administration of the City's extraterritorial-jurisdiction functions under Chapter 42—including the issuance and purported rescission of the ETJ releases at issue.

8.    Defendant Keith Mars is the Director of the City of Austin Development Services Department and is sued in his official capacity. On information and belief, the Development Services Department administers petitions for release from the City's ETJ under Chapter 42 and is responsible for issuing the March 2026 retraction letters at issue.

### ASSOCIATIONAL STANDING

9.    POWER has associational standing to sue on behalf of its members under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977), and its progeny.

10.    *First*, POWER's members have standing to sue in their own right. Each, like Schoenstatt (a POWER member), has suffered a concrete and particularized injury fairly traceable to the City's retraction of their ETJ releases and redressable by the relief sought here.

11.     *Second*, the interests POWER seeks to protect are germane to its organizational purpose. POWER was formed specifically to vindicate the statutory and constitutional rights of property owners whose ETJ releases the City has purported to rescind, and the relief sought in this action is precisely the relief POWER exists to obtain.

12.     *Third*, neither the claims asserted nor the relief requested requires the participation of individual members. POWER seeks only declaratory and injunctive relief. The legality of the City's retraction may be determined on a record common to all affected property owners.

13.     Schoenstatt also has Article III standing in its own right based on the concrete injury described in the Factual Allegations and Injury sections below. Schoenstatt, POWER, and its members are collectively referred to as the "Property Owners."

### FACTUAL ALLEGATIONS

#### *The Texas Legislature gives property owners a path to municipal freedom.*

14.     Chapter 42 of the Texas Local Government Code governs the extraterritorial jurisdictions of Texas municipalities.

15.     An ETJ is the unincorporated area adjacent to a city's corporate boundaries within which the city exercises certain planning and regulatory powers.

16.     For most of Texas's modern history, ETJ control was a one-way ratchet. Once land fell within a city's ETJ, the city held that regulatory authority indefinitely, and the landowner had no meaningful recourse. The ETJ grew as the municipality's population grew, regardless of whether the affected landowners had any interest in—or connection to—the imposing city.

17.     That changed in 2023. Responding to widespread concern that Texas municipalities were wielding ETJ authority as a tool of regulatory overreach—imposing zoning-

like restrictions on rural and suburban landowners who received none of the services or voting rights that justify municipal regulation—the Texas Legislature passed Senate Bill 2038. *See* Act of May 19, 2023, 88th Leg., R.S., 2023 Tex. Sess. Law Serv. ("S.B. 2038") (codified at TEX. LOC. GOV'T CODE §§ 42.101—.105).

18. S.B. 2038 fundamentally rebalanced the relationship between Texas municipalities and the landowners subject to their ETJ authority, creating a statutory right for landowners to petition for automatic release from a municipality's ETJ.

19. Under the amended statute, a qualifying landowner may file a petition with the municipality, and if the statutory conditions are met, the area is released mandatorily and automatically. TEX. LOC. GOV'T CODE § 42.105(c).

20. Section 42.105(c) requires that "the municipality shall immediately release the area from the municipality's extraterritorial jurisdiction." And if a municipality fails to act within 45 days of receiving the petition, "the area is released by operation of law." *Id.* § 42.105(d).

21. The Legislature's message was clear: a municipality does not have a vested entitlement to exercise dominion over the properties currently in its ETJ. This jurisdiction is a regulatory tool that must yield to the property rights of the individuals it burdens.

22. The legislative record accompanying S.B. 2038 reflects lawmakers' specific concern that municipalities were using ETJ authority to impose land-use restrictions on property owners who had no voice in city government and no access to city services—regulation without representation. *See* Bill Analysis, Tex. S.B. 2038, 88th Leg., R.S. (House Comm. on Land & Res. Mgmt. 2023). The ETJ release mechanism was designed to give those landowners a meaningful exit. It is not a formality subject to the City's whims.

*The Legislature ensures military bases will be protected from federal closure.*

23.     The qualifications for eligibility to petition for ETJ release are straightforward: be a resident or owner of a majority in value of an area that you wish to remove from an ETJ. *See* TEX. LOC. GOV'T CODE § 42.102.

24.     There are, however, five narrow exceptions to this blanket right to release. Relevant here, § 42.101(b) provides that an otherwise eligible property may not rely on Chapter 42's automatic-release process if it is "within five miles of the boundary of a military base, as defined by Section 43.0117, at which an active training program is conducted" (the "Military Base Exception"). TEX. LOC. GOV'T CODE § 42.101(b).

25.     Section 43.0117, in turn, defines "military base" to mean "a presently functioning federally owned or operated military installation or facility."

26.     The statute does not define "military installation" or "facility."

27.     The legislative history, however, demonstrates that the Military Base Exception was enacted to protect bases from closure by the federal government.

28.     In the 1980s, the federal government reinvigorated its decades-old Base Realignment and Closure ("BRAC") process to close and realign military installations nationwide, including in Texas.

29.     One factor that exposed military sites to closure was close proximity to land uses incompatible with the bases' purpose and mission.

30.     This concern was front of mind for Texas lawmakers when considering whether to modify the ETJ-release process.

6

31.    For instance, when an early draft of the ETJ-removal legislation was introduced, Texas lawmakers filibustered the bill to demand inclusion of the Military Base Exception to protect compatible land use near military bases.

32.    Specifically, legislators expressed concern that nearby land could be "developed improperly near military bases," which "could heighten their chances of being shuttered in case the federal government undertakes another [BRAC] process." *See* Cassandra Pollock and Brandon Formby, *Texas Sen. Menendez Begins Filibuster of County Annexation Bill*, Tex. Tribune (May 28, 2017). They also noted that unfettered ETJ removals "could put military bases at risk of closure" because "[o]ne of the major considerations during the [BRAC] process is compatible land uses near bases." Bill Analysis, Tex. S.B. 6, 85th Leg., R.S. (House Research Org. 2017).

33.    The Military Base Exception was thus born of a specific, narrow concern: preventing Texas's military bases from being closed through the BRAC process due to incompatible neighboring land uses.

34.    As noted, the statute does not define "military installation" or "facility." But federal law does. Under federal law, the term "military installation" refers to "a base, camp, post, station, yard, center, homeport facility for any ship, or other activity *under the jurisdiction of the Department of Defense*, including any leased facility." 10 U.S.C. § 2687(g)(1) (emphasis added).

35.    The qualifying phrase "under the jurisdiction of the Department of Defense" restricts the definition of "military installation" to those areas subject to the DoD's authority—specifically, its authority to close or realign the site under BRAC.

36.    Reading "facility" in harmony with "military installation," as required by the canons of construction, this term must also be limited to structures subject to DoD jurisdiction.

37.    The phrase "federally owned or operated" modifies "military installation or facility," and a "military installation or facility" is one that the Department of Defense has authority to close or realign—including through the BRAC process. A site that the DoD has no unilateral authority to close or realign is not a "military installation or facility," regardless of who holds title to the underlying land. Mere federal title to the land beneath a facility operated by the State does not make the facility a "federally owned" military installation.

38.    Together, the legislative history and canons of construction reveal that "military installation or facility" can only logically be understood to have one meaning: a military site subject to closure by the DoD through the BRAC process.

### *The Property Owners petitioned for, and the City granted, their releases from the City's ETJ.*

39.    The Property Owners are among scores of individuals and entities who petitioned the City for their properties to be released from the City's ETJ under Chapter 42.

40.    They include non-profits who need to expand to meet the needs of those they serve; developers and investors who have committed significant capital to bring housing, job opportunities, and tourism revenue to Travis County; and individual landowners who purchased land outside of the City's limits to live and use their property free from the burdensome restrictions of a city in which they have no voice.

41.    Each Property Owner's petition for release satisfied all of the statutory requirements of Texas Local Government Code §§ 42.101—42.104.

42.    Eligibility under Chapter 42 is a precondition to satisfying *any* of the Chapter 42 requirements. Chapter 42's release process expressly does not apply to a property excluded by § 42.101—including a property within five miles of a military base—meaning the property cannot

satisfy §§ 42.102 and 42.104 or be released under § 42.105. By confirming that a property owner's petition satisfies the statutory requirements and will be released, the City necessarily determines that Chapter 42 is applicable and no § 42.101 exception precludes the property from release.

43. Following its review of each petition, the City issued a written confirmation letter informing the Property Owner that the petition met the statutory requirements identified in Texas Local Government Code §§ 42.102 and 42.104, and that their property would be formally released from the City's ETJ as determined by § 42.105(d).

44. Under § 42.105(d), if a petition satisfies all statutory requirements, the property is released by operation of law 45 days after the petition was filed.

45. Each Property Owner's property was, thus, conclusively and formally released from the City's ETJ 45 days after their petition was filed. The City's jurisdiction was relinquished as a matter of law, and the properties came under the exclusive jurisdiction of Travis County.

46. The Property Owners reasonably and justifiably relied on the City's written confirmation of release. For periods ranging from months to nearly three years, they operated, planned, invested, and contracted on the understanding that they were outside the City's ETJ.

### *The City attempts to void the releases and reassert jurisdiction.*

47. On March 13, 2026, without any warning, the City sent letters to those whose properties had been released from the City's ETJ, including each of the Property Owners, informing them that—months or years after being released—the City had determined that the prior confirmation letters "were issued in error and **are void and of no force or effect**."

48. "Upon further review," the City claimed, it had "determined that [each] property is located within five miles of the boundary of a military base, known as the Bee Caves Armory."

9

49.    Suddenly deciding that the Military Base Exception applied, the City claimed that each "**property is not eligible for release from the City's ETJ. Therefore, the property remains within the boundaries of the City's ETJ, and all applicable municipal authority, regulations, benefits, and obligations remain in effect.**"

50.    The City offered no avenue for review or a hearing.

51.    Indeed, the City has expressly disclaimed any opportunity for review, declaring, in writing, that "**no administrative appeal process is available for this determination.**"

52.    With no administrative process—formal or informal—to challenge the City's retraction, the Property Owners are left without any avenue for review absent judicial intervention.

53.    Since September 2023, approximately 170 properties located within five miles of Bee Caves Armory have been released from the City's ETJ under § 42.105(d).

54.    In other words, on approximately 170 separate occasions, the City determined that the Military Base Exception did not apply to properties within five miles of Bee Caves Armory, necessarily meaning that, approximately 170 times, the City determined that Bee Caves Armory was not a "military base," as that term is defined in the statute.

55.    On information and belief, all owners of the 170 released properties received a retraction letter materially similar to the one received by the Property Owners here.

56.    The City's retraction had immediate consequences for the Property Owners.

57.    In addition to depriving each of the Property Owners their constitutional rights, the City's reassertion of jurisdiction immediately subjected them to the City's onerous land-use restrictions, which they had been free from for months or *years*, and detrimentally interfered with their ability to use their properties.

58.    For instance, educational institutions like St. Michael's Catholic Preparatory School had their expansion projects brought to a halt because the City's regulations, such as impervious cover restrictions, do not allow for the planned expansion.

59.    Property Owners using their land for development and investment suffered the same result. They acted in direct reliance on the City's written confirmation of their ETJ releases—investing incalculable time, money, and resources into architectural plans, permitting processes, construction contracts, and more. But because of the land-use restrictions the City has purported to reinstate on these properties, the projects cannot move forward, threatening *hundreds of millions* in hard costs and immeasurable opportunity costs for the community as a whole.

60.    Indeed, the City's efforts to reclaim jurisdiction threaten to destroy any opportunity for Austin's western doorstep to ever develop, to the detriment of Austin itself.

61.    Likewise, numerous Property Owners either had contracts for the sale of their properties or were planning to sell their properties when the City issued its retraction. For those already under contract, the sales are at material risk of cancellation, since the City's land-use restrictions are too burdensome to allow the property to be used for its highest and best use. And for those not yet under contract, the City's retraction substantially reduces their property values and ability to sell. Indeed, some have been informed that the market value of their property has plummeted to approximately one-third of the purchase price since the City's reassertion of jurisdiction because of the land-use limitations the City's regulations impose.

62.    Most fundamentally, *all* of the Property Owners—including non- and for- profit businesses and individuals—intentionally purchased land outside of Austin's city limits to increase the enjoyment and use of their properties, free from dense-community regulations.

11

63.     The Property Owners are willing to abide by the less onerous regulations imposed by Travis County and applicable state law. They do not, however, want to be subjected to the City's regulatory authority, whose restrictions were not designed for rural and semi-rural properties.

64.     That is why they petitioned for release from the ETJ.

65.     Each Property Owner received written confirmation that their petition satisfied the statutory requirements and that their property would be released by operation of law—some as long ago as late 2023 and early 2024, as soon as release became a statutory possibility.

66.     Under the City's reassertion of ETJ authority, they are suddenly re-subjected to land-use restrictions they had been free from for, in some cases, years.

67.     The Property Owners' concerns about the City's reassertion of authority are not hypothetical or overstated. The *same day* that the City sent its retraction letters, it began posting violation notices on properties that, minutes before, were outside the City's grasp.

68.     The City's attempt to retract these releases is itself emblematic of why the Property Owners do not want to be under the City's jurisdiction: the City does not hesitate to overstep its lawful authority and has displayed its unwillingness to admit, much less remedy, its errors.

### *Schoenstatt's experience exemplifies the City's misconduct and its consequences.*

69.     The Schoenstatt Movement of Austin is a nonprofit religious entity and the Austin chapter of an international movement of Catholics striving for the spiritual renewal of their faith in the contemporary world.

70.     Schoenstatt's core mission is to provide a place of fellowship—a location where people can encounter Christ and reinvigorate their faith.

71.    To serve its mission, Schoenstatt has developed a 2.5-acre campus centered around the Marian Shrine of Our Lady of Schoenstatt, which has become a place of pilgrimage for the Diocese of Austin and beyond.

72.    In addition to the Shrine, individuals visit Schoenstatt's campus to attend Mass, participate in retreats, and reflect in Eucharistic adoration.

73.    Over the years, Schoenstatt has outgrown its existing space.

74.    Due to space constraints, Schoenstatt currently holds Mass outdoors, and when it rains or the weather is otherwise inclement, Schoenstatt is forced to turn parishioners away because its existing covered facilities cannot accommodate the congregation.

75.    This is a solvable problem for Schoenstatt.

76.    While its existing *developed* campus is only 2.5 acres, its property is approximately 17.65 acres, which can be developed to accommodate Schoenstatt's growing community—just not from within the City's ETJ.

77.    Because of the City's land-use restrictions, including its impervious cover restrictions, Schoenstatt cannot further develop its land within the City's ETJ.

78.    Chapter 42 offered Schoenstatt a path to continue its mission.

79.    On July 2, 2024, Schoenstatt petitioned for its property to be released from the ETJ, and on August 1, 2024, the City confirmed that its petition met the statutory guidelines for release and would "be formally released from the City of Austin's ETJ as determined by Texas Local Government Code Sec[.] 42.105(d)"—i.e., by operation of law on August 16, 2024.

80.     Based on this release, Schoenstatt hired a design and architectural firm, had conceptual drawings completed, and invested significant resources—both financial and volunteer hours—in an aggressive fundraising campaign.

81.     Then, on March 13, 2026, the City issued a letter purporting to immediately retract Schoenstatt's release from the ETJ.

82.     Schoenstatt was not offered advanced notice of or an opportunity to challenge the City's retraction.

83.     The City's letter has brought Schoenstatt's development efforts to a standstill and left the movement in an indefinite limbo where its parishioners and visitors, at best, attend Mass under the hot Texas sun and, at worst, are turned away when services cannot be held outdoors.

84.     Schoenstatt's ability to fulfill its religious mission to the Austin diocese depends on the validity of its ETJ release.

### *The City's retraction is built on a foundation of sand.*

85.     As the Property Owners' experiences demonstrate, the outrageousness of the City's conduct is unquestionable. It is also multifaceted.

86.     *First*, the City's determination that the Military Base Exception applies is built on a faulty premise: Bee Caves Armory is not a "military base," as that term is defined in the statute.

87.     As previously noted, the Military Base Exception exists to protect bases from closure by the federal government via the BRAC process.

88.     A "military base," as that term is used in the statute, refers to a military site with an active training program that can be closed or realigned by the DoD as part of the BRAC process.

89.    Bee Caves Armory is a facility located in Travis County, Texas, and used by members of the Texas Army National Guard ("TXANG"), particularly the 71st Troop Command.

90.    It is located on federally owned land that is leased to the State of Texas.

91.    It is a state facility operated by the TXANG under the authority of the Governor of Texas and the Adjutant General of Texas.

92.    Under Texas law, the Governor is the Commander-in-Chief of Texas military forces, including the TXANG, and the Adjutant General has "decision making authority on all matters concerning the location and maintenance of military forces and facilities," including "Texas military forces armories." TEX. GOV'T CODE §§ 437.002, 437.054(a).

93.    Bee Caves Armory does not appear on the federal government's list of "military installations." *See* MilitaryOneSource, https://installations.militaryonesource.mil/view-all (last visited May 20, 2026) (an official website of the U.S. Government). Nor does it appear on Texas's list of "military installations." *See* Active Duty Military Installations, Office of the Texas Governor, https://gov.texas.gov/organization/military/installations (last visited May 20, 2026).

94.    The DoD does not have unilateral authority to close or realign Bee Caves Armory.

95.    Federal law expressly provides that TXANG facilities "may not be relocated or withdrawn . . . without the consent of the governor of the State." 10 U.S.C. § 18238.

96.    Likewise, 10 U.S.C. § 2684a expressly distinguishes "military installation" from "State-owned National Guard installation"—further confirming that a Texas Army National Guard armory is categorically distinct from a "military installation."

15

97. Because the DoD cannot unilaterally close or realign Bee Caves Armory, the Armory is not a "military installation or facility" within the meaning of § 43.0117, and it, thus, does not constitute a "military base" for purposes of § 42.101.

98. *Second*, as Texas courts have long recognized, "[a] municipal corporation's powers cease at municipal boundaries and cannot, without plain manifestation of legislative intention, be exercised beyond its limits." *Ex parte Ernest*, 136 S.W.2d 595, 597 (Tex. Crim. App. 1939).

99. Relevant here, neither Chapter 42 nor the City's charter grants the City any authority to reconsider, revisit, or void a completed ETJ release. Nor did the City identify any statute, ordinance, or constitutional provision authorizing such action.

100. To the contrary, once effectuated, a municipality's release of property from its ETJ creates a vested right in operating outside of the City's jurisdiction.

101. The City may not unilaterally revoke such a release to the detriment of those acting in reliance on it, much less can it do so without compliance with the procedural and substantive requirements of state and federal law.

102. The Property Owners justifiably relied on the City's releases to their significant detriment—committing capital, executing contracts, undertaking expansion projects, and making major decisions on the understanding that their properties were outside the City's jurisdiction.

103. The City's attempt to deprive the Property Owners of those vested property interests without due process of law was a procedural ambush.

104. They had no opportunity to receive and review the City's claim, consult counsel, challenge the jurisdictional determination, or seek relief before the City began asserting authority over their properties.

105.    Indeed, the City began issuing notices of violation the same day it issued its retraction letters, demonstrating the City's immediate assertion of regulatory domain without any notice or opportunity to be heard.

106.    In light of the City's retraction letters and the City's threats of enforcement actions (sending notices of violation and demanding immediate compliance with the City's ETJ regulations at the risk of significant criminal and civil liability), the threat of further injury to the Property Owners is actual and imminent.

### *The City's actions were taken according to its official policy or custom.*

107.    The City's retraction letters and reassertion of ETJ authority constitute the actions of a final policymaker.

108.    The officials responsible for the City's decision to rescind the ETJ releases—including those who directed, authorized, or ratified the retraction letters—acted as final policymakers.

109.    The City's actions further reflect an official policy or custom of the City.

110.    The City's rescission of ETJ releases on the asserted ground that properties lie within five miles of Bee Caves Armory was not the isolated act of a rogue employee.

111.    Rather, it reflects a deliberate, institutional determination by City officials acting pursuant to the City's purported (and self-serving) interpretation of Texas Local Government Code § 43.0117—an interpretation that City leadership adopted, communicated in official written correspondence, and has continued to assert in the face of legal challenge.

112.    Indeed, on information and belief, the City has acted on this determination and purported to reassert jurisdiction it ceded approximately 170 times.

17

113.     Such deliberate and persistent conduct constitutes an official policy or custom.

114.     The City's issuance of materially identical retraction letters to the owners of approximately 170 properties reflects a single, uniform City policy—not the isolated act of any individual employee—and is itself an official policy of the City.

115.     On information and belief, that policy was adopted, directed, authorized, or ratified by the City's final policymakers, including the City Manager and the Director of the Development Services Department, who hold final policymaking authority over the administration of the City's Chapter 42 extraterritorial-jurisdiction functions by delegation under the City Charter and the City's council-manager form of government.

116.     The City further ratified the policy by continuing to assert its interpretation and right to retract the releases in the face of opposition and by declaring that "[n]o administrative appeal process is available for this determination."

117.     The City's policy or custom of rescinding ETJ releases was the moving force behind the constitutional violations alleged herein.

118.     But for the City's adoption and implementation of that policy or custom, the Property Owners would not have been deprived of their property interests without due process and would not have sustained the injuries described herein.

## INJURY TO PLAINTIFFS

119.     By asserting jurisdiction it does not possess and rescinding ETJ releases it had no authority to void, the City has directly and proximately caused the Property Owners significant harm, including but not limited to:

   a. Depriving the Property Owners of their rights under the U.S. and Texas Constitutions;

18

b.  Forcing the Property Owners to endure an unconstitutional process;

c.  Re-imposing regulatory restrictions that prevent the Property Owners from using their properties for their intended and highest-and-best uses;

d.  Halting or threatening to halt expansion projects that were undertaken in reliance on the City's confirmed ETJ releases;

e.  Placing pending property transactions at imminent risk of collapse;

f.  Subjecting the Property Owners to land-use restrictions that are neither designed nor appropriate for their properties, and to which they are unwilling to submit absent representation in the City's government;

g.  Depriving the Property Owners of their vested right to operate their properties free from the City's restrictions;

h.  Creating regulatory uncertainty that impairs the Property Owners' ability to attract donors, investors, buyers, and financing, and to fulfill contractual obligations;

i.  Forcing the Property Owners to forfeit or place at risk capital, fundraising, architectural and design fees, and other expenditures made in direct reliance on the City's confirmed ETJ releases; and

j.  Forcing the Property Owners to incur legal expenses to vindicate constitutional rights that the City was obligated to respect from the outset.

**CAUSES OF ACTION**

**Count I**
**Violation of Procedural Due Process**
**(42 U.S.C. § 1983; U.S. CONST. AMEND. XIV)**

120.  The Property Owners incorporate Paragraphs 1–119 as if fully set forth herein.

121.  The Due Process Clause of the Fourteenth Amendment prohibits the government from depriving any person of life, liberty, or property without due process of law.

122.  At its irreducible minimum, due process requires reasonable notice and a meaningful opportunity to be heard. The City provided neither.

123.  The Property Owners possess constitutionally protected property interests in: (i) their real property and all improvements thereon; (ii) the ETJ releases issued by the City, upon

19

which they reasonably and detrimentally relied; and (iii) the vested right to develop and use their properties free from the City's ETJ authority, created by the City's own written confirmation letters and the subsequent release of the properties by operation of law under Texas Local Government Code § 42.105.

124.    Each of these is a property interest protected by the Fourteenth Amendment.

125.    These interests further arise from Chapter 42's mandatory, non-discretionary command that a qualifying area "shall" be released "immediately" and "is released by operation of law." TEX. LOC. GOV'T CODE § 42.105(c)–(d). They do not depend on the City's discretion or grace. The City's written confirmations acknowledged and affirmed a release that the statute itself compelled. At a minimum, where the City now contends the properties were ineligible, that disputed eligibility determination is precisely the kind of question that due process required the City to resolve through notice and a hearing before acting on its own conclusion.

126.    The City, acting under color of state law, unilaterally rescinded the ETJ releases and reasserted regulatory authority over the Property Owners' land—thereby depriving them of their protected property interests—without notice or any opportunity to be heard.

127.    The City did not initiate an administrative proceeding. It did not issue a notice of proposed action. It did not afford the Property Owners a single day to respond. It sent a letter declaring the releases void and began asserting regulatory authority the same day.

128.    The timing of the City's actions is constitutionally significant. On the same day the City mailed its letters purporting to void the ETJ releases, it began reasserting regulatory authority over the properties, and it began sending violation notices.

129. The Property Owners had no opportunity—not a single day—to receive and review the City's claim, consult counsel, challenge the jurisdictional determination, or seek injunctive relief before the deprivation took effect. Simultaneous deprivation and notice is no notice at all.

130. The City's failure to provide pre-deprivation process cannot be excused by practical necessity or emergency. Pre-deprivation process was entirely feasible: the City had ample time to notify the Property Owners of its changed interpretation of the Military Base Exception and to provide a meaningful opportunity to contest that interpretation before acting.

131. The City made a deliberate institutional decision to act unilaterally and without process—it was not facing an emergency or a situation where notice was a practical impossibility.

132. Because the City's retraction was carried out pursuant to its established policy and by officials with authority to act, and not as a random or unauthorized act of a subordinate employee, pre-deprivation process was both required and feasible, and no post-deprivation state remedy excuses the City's failure to provide it.

133. Even if the City's eligibility determination were genuinely disputed, the City was constitutionally required to provide notice and an opportunity to be heard before unilaterally resolving that dispute against the Property Owners and depriving them of their interests.

134. As a direct and proximate result of the City's procedural due process violations, the Property Owners have suffered the harms set forth in Paragraph 119 above and are entitled to declaratory and injunctive relief and, on behalf of Schoenstatt, to nominal damages.

135. Unless the City is enjoined from asserting ETJ authority over the Property Owners' properties, they will suffer continuing and irreparable harm.

## Count II
## Violation of Substantive Due Process
### (42 U.S.C. § 1983; U.S. CONST. AMEND. XIV)

136.    The Property Owners incorporate Paragraphs 1–119 as if fully set forth herein.

137.    The substantive component of the Due Process Clause protects against arbitrary, conscience-shocking deprivations of property.

138.    Government conduct that is arbitrary, irrational, or unjustifiable in light of the circumstances—or that reflects a deliberate abuse of power—violates substantive due process.

139.    The Property Owners possess fundamental property interests in their ETJ releases and in the vested right to develop and use their properties free from the City's restrictions. Those interests are protected by the substantive component of the Due Process Clause.

140.    The City's conduct shocks the conscience and constitutes an arbitrary and unjustifiable deprivation of Plaintiffs' protected property interests.

141.    *First*, the City made approximately 170 independent, official determinations that properties within five miles of Bee Caves Armory were eligible for ETJ release—expressly confirming in writing that the statutory conditions were met. The City then abruptly reversed course without notice, without legal authority, and without any changed circumstance to justify the reversal. A government reversal of its own prior official determinations, made in the face of substantial reliance, is the paradigmatic case of arbitrary government action.

142.    *Second*, the City's reversal is predicated on a legally untenable interpretation of the Military Base Exception—one the City itself had implicitly and repeatedly rejected across approximately 170 prior releases—that is unsupportable under the text, history, and purpose of

22

Texas Local Government Code §§ 42.101 and 43.0117. Government action that has no lawful basis is, by definition, arbitrary.

143.   *Third*, the City's reversal was timed to maximum prejudice. The City waited until, in some cases, *years* after the Property Owners had organized their religious, educational, commercial, and personal affairs in reliance on the releases to reconsider its decision and purport to void the releases. The City's conduct was not merely arbitrary; it was devastating in its consequences and, given its timing, impossible to characterize as anything other than a conscience-shocking deprivation.

144.   The City's conduct, therefore, constitutes a deprivation of the Property Owners' constitutionally protected property interests without due process of law, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

145.   Further, a government body that acts in complete excess of its lawful authority—that has no power whatsoever to take the action it took—cannot satisfy even rational basis review. There is no legitimate governmental interest served by an *ultra vires* action.

146.   The City had no authority to rescind the Property Owners' ETJ releases. No statute, ordinance, or provision of the City's charter grants the power to void an ETJ release.

147.   As a direct and proximate result of the City's substantive due process violations, the Property Owners have suffered the harms set forth in Paragraph 119 and are entitled to declaratory and injunctive relief and, on behalf of Schoenstatt, to nominal damages.

148.   Unless the City is enjoined from continuing to assert ETJ authority over the Property Owners' properties, they will suffer continuing and irreparable harm.

**Count III**
**Violation of Due Course of Law**
**(TEX. CONST. art. I, § 19)**

149.    The Property Owners incorporate Paragraphs 1–119 as if fully set forth herein.

150.    Article I, § 19 of the Texas Constitution provides that no citizen of this State shall be deprived of life, liberty, property, privileges, or immunities, or in any manner disfranchised, except by the due course of the law of the land.

151.    The Property Owners possess constitutionally protected property interests under the Texas Constitution, including: (i) their real property and all improvements thereon; (ii) the ETJ releases issued by the City, upon which Plaintiffs reasonably and detrimentally relied; and (iii) the vested right to develop and use their properties free from the City's ETJ authority, created by the City's own written releases and confirmed by operation of law.

152.    The City, acting without lawful authority, rescinded its release of jurisdiction and reasserted ETJ regulatory authority over the Property Owners' properties—thereby depriving them of their protected property interests—without prior notice or any opportunity to be heard.

153.    This deprivation was accomplished by nothing more than a letter that, according to the City, took immediate effect.

154.    The Texas Constitution imposes a robust requirement of procedural regularity before the government may deprive a person of a protected property interest.

155.    The City provided none of the processes that Texas law requires.

156.    The City's conduct was also arbitrary, capricious, and without rational basis under the substantive component of Article I, § 19.

24

157.    Between 2023 and early 2026, the City released approximately 170 properties within five miles of Bee Caves Armory from its ETJ—making 170 independent determinations that such properties were eligible for release.

158.    It then abruptly reversed course without notice or legal authority and began issuing notices of violation the same day.

159.    That reversal, predicated on a legally erroneous interpretation of the Military Base Exception that the City itself had repeatedly rejected through its own conduct, shocks the conscience and cannot survive even rational basis review.

160.    As a direct and proximate result of the City's violations, the property Owners have suffered the harms set forth in Paragraph 119 and are entitled to declaratory and injunctive relief.

161.    Unless the City is enjoined from continuing to exercise jurisdiction over the Property Owners' properties, they will suffer continuing and irreparable harm.

**Count IV**
**Declaratory Judgment: Plaintiffs' ETJ Releases are Valid and in Effect**
**(28 U.S.C. §§ 2201—2202; TEX. LOC. GOV'T CODE §§ 42.101—42.105)**

162.    The Property Owners incorporate Paragraphs 1–119 as if fully set forth herein.

163.    An actual controversy exists between the Property Owners and the City as to whether the ETJ releases are valid and in full force and effect.

164.    Each Property Owner satisfied all conditions for ETJ release under Texas Local Government Code §§ 42.101—42.104. Each Property Owner's property was, therefore, legally released from the City's ETJ.

165. Bee Caves Armory does not constitute a "military base" within the meaning of §§ 43.0117 and 42.101 because it is a Texas Army National Guard facility not subject to unilateral closure or realignment by the DoD—either through the BRAC process or otherwise.

166. The Property Owners are, therefore, entitled to a declaration that: (a) their ETJ releases are valid, lawful, and remain in effect; (b) the City's attempts to rescind those releases are void and of no legal effect; and (c) their properties are not within the City's ETJ.

**Count V**
**Declaratory Judgment: The City's *Ultra Vires* Acts are Void**
**(28 U.S.C. §§ 2201—2202; TEX. LOC. GOV'T CODE §§ 42.101—42.105)**

167. The Property Owners incorporate Paragraphs 1–119 as if fully set forth herein.

168. Home-rule cities such as Austin derive their powers of local self-government from the Texas Constitution, but those powers are limited by general laws enacted by the Legislature.

169. Where the Legislature has enacted a comprehensive statutory scheme governing a particular subject, a home-rule city may not act beyond the scope of, or inconsistent with, that scheme.

170. Further, municipalities are expressly prohibited from exercising power beyond their municipal boundaries absent specific legislation authorizing such action.

171. Chapter 42 of the Texas Local Government Code is a general law that regulates ETJ releases and prescribes the procedures by which releases are granted and take effect.

172. Nothing in Chapter 42—or in the City's charter—authorizes a municipality to reconsider, rescind, or void a completed ETJ release for any reason.

26

173.    To the contrary, once an area is released from an ETJ, regulation of that land returns to the county. The City has no statutory authority to reconsider, rescind, or void an ETJ release once it has taken effect.

174.    The City's attempts to rescind the Property Owners' releases and its continued assertion of ETJ authority over the Property Owners' properties, therefore, constitute acts in excess of the City's legal authority—i.e., *ultra vires* conduct.

175.    As the City's chief administrative officer, City Manager T.C. Broadnax holds final authority over the administration of the City's extraterritorial-jurisdiction functions under Chapter 42—including the issuance and purported rescission of the ETJ releases at issue.

176.    As the Director of the City of Austin Development Services Department, Keith Mars is responsible for issuing the March 2026 retraction letters without authority.

177.    Acting in their official capacities, Mr. Broadnax and Mr. Mars effectuated the City's *ultra vires* actions.

178.    The Property Owners are entitled to a declaration that the City's purported rescission of their ETJ releases was *ultra vires*, void ab initio, and without legal force or effect.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against the Defendants, and grant the following relief:

a. A declaratory judgment that: (i) all ETJ releases issued to Plaintiffs pursuant to Texas Local Government Code §§ 42.101—42.105 are valid, lawful, and remain in full force and effect; (ii) the City's attempts to rescind the ETJ releases are void ab initio and of no legal effect; and (iii) the City lacks any ETJ authority over Plaintiffs' properties;

b. A declaratory judgment that the City's purported rescission of Plaintiffs' ETJ releases and all subsequent conduct purporting to assert ETJ authority are *ultra vires* and void;

27

c.  A preliminary injunction prohibiting the City from asserting, enforcing, or threatening to enforce ETJ authority over any property whose ETJ release was declared void based on its proximity to Bee Caves Armory during the pendency of this action;

d.  A permanent injunction prohibiting the City from asserting, enforcing, or threatening to enforce ETJ authority over any property whose ETJ release was declared void based on its proximity to Bee Caves Armory, and directing the City to retract all unlawful retraction letters and any action it took based upon its purported rescission of ETJ removal;

e.  Nominal damages in the amount of one dollar ($1.00) to Schoenstatt on each of its claims under 42 U.S.C. § 1983;

f.  Attorney fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable statute;

g.  Pre- and post-judgment interest at the maximum rate permitted by law; and

h.  Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,

*Alexa L. Gervasi*
Bill Cobb
Texas Bar No. 00796372
Alexa L. Gervasi
Texas Bar No. 24147091
COBB & GERVASI, PLLC
1250 S. Capital of Texas Hwy
Building 3, Suite 400
Austin, Texas 78746
(512) 955-5209
bill@cobbgervasi.com
alexa@cobbgervasi.com

*Counsel for Plaintiffs*