**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |
|---|---|
| PROPERTY OWNERS WITHSTANDING ETJ RETRACTIONS; and THE SCHOENSTATT MOVEMENT OF AUSTIN,<br><br>*Plaintiffs,*<br><br>v.<br><br>CITY OF AUSTIN; T.C. BROADNAX, *in his official capacity* as City Manager; and KEITH MARS, *in his official capacity* as Director of Development Services Department,<br><br>*Defendants.* | Civil Action No. 1:26-cv-01518-RP |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND
REQUEST FOR EXPEDITED CONSIDERATION**

Bill Cobb (TX Bar No. 00796372)
Alexa L. Gervasi (TX Bar No. 24147091)
**COBB & GERVASI, PLLC**
1250 S. Capital of Texas Hwy
Building 3, Suite 400
Austin, Texas 78746
(512) 955-5209
bill@cobbgervasi.com
alexa@cobbgervasi.com

*Counsel for Plaintiffs*

TABLE OF CONTENTS

INTRODUCTION .......................................................................................................................1

FACTUAL BACKGROUND .......................................................................................................1

LEGAL STANDARD ..................................................................................................................7

ARGUMENT .............................................................................................................................8

    I. The Property Owners are likely to succeed on the merits. ..................................8

       A. The City deprived the Property Owners of procedural due process. .........8

       B. The City issued the March Retractions without legal authority. ...............12

    II. The Property Owners will suffer irreparable harm absent an injunction. ....................14

    III. The balance of equities favors an injunction in service of the public interest. ............16

UNOPPOSED REQUEST FOR EXPEDITED CONSIDERATION ........................................16

CONCLUSION .........................................................................................................................17

CERTIFICATE OF CONFERENCE .......................................................................................19

CERTIFICATE OF SERVICE .................................................................................................19

i

TABLE OF AUTHORITIES

**Cases**

*Alexander Oil Co. v. City of Seguin*,
825 S.W.2d 434 (Tex. 1991) ..................................................................................... 14

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972) ............................................................................................ 8, 9

*Bell v. Burson*,
402 U.S. 535 (1971) ................................................................................................ 10

*Bowlby v. City of Aberdeen*,
681 F.3d 215 (5th Cir. 2012) ........................................................................ 9, 10, 11

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*,
17 F.4th 604 (5th Cir. 2021) ................................................................................... 15

*City of Corpus Christi v. Unitarian Church of Corpus Christi*,
436 S.W.2d 923 (Tex. Civ. App. 1968) .................................................................. 12

*City of El Paso v. Heinrich*,
284 S.W.3d 366 (Tex. 2009) ................................................................................... 13

*City of Houston v. Carlson*,
393 S.W.3d 350 (Tex. App. 2012) .......................................................................... 10

*City of Laredo v. Laredo Merchants Ass'n*,
550 S.W.3d 586 (Tex. 2018) ................................................................................... 12

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) ................................................................................................ 11

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
710 F.3d 579 (5th Cir. 2013) .............................................................................. 7, 15

*Elliott v. City of College Station*,
717 S.W.3d 888 (Tex. 2025) ................................................................................ 9, 12

*Elrod v. Burns*,
427 U.S. 347 (1976) ................................................................................................ 15

*Ex parte Ernest*,
136 S.W.2d 595 (Tex. Crim. App. 1939) ................................................................ 12

*Fuller Springs v. State ex rel. City of Lufkin*,
513 S.W.2d 17 (Tex. 1974) ..................................................................................... 14

*Goldberg v. Kelly*,
397 U.S. 254 (1970) ................................................................................................ 10

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
804 F.2d 1390 (5th Cir. 1986) ................................................................................ 15

*In re Kelso*,
   196 B.R. 363 (Bankr. N.D. Tex. 1996) .................................................................9

*Jackson Women's Health Org. v. Currier*,
   760 F.3d 448 (5th Cir. 2014) ..........................................................................16

*LIA Network v. City of Kerrville*,
   163 F.4th 147 (5th Cir. 2025)............................................................................7

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ......................................................................................... 11

*MC Trilogy Tex., LLC v. City of Heath*,
   662 F. Supp. 3d 690 (N.D. Tex. 2023) ............................................................14

*Nken v. Holder*,
   556 U.S. 418 (2009)..........................................................................................16

*Reed v. Goertz*,
   598 U.S. 230 (2023) ...........................................................................................8

*Santiago v. Noem*,
   2025 WL 2606118 (W.D. Tex. Sept. 9, 2025) ...................................................7

*Sherbert v. Verner*,
   374 U.S. 398 (1963) .........................................................................................10

*Simi Inv. Co. v. Harris County*,
   236 F.3d 240 (5th Cir. 2000).............................................................................9

*Slochower v. Board of Education*,
   350 U.S. 551 (1956).........................................................................................10

*Speiser v. Randall*,
   357 U.S. 513 (1958) .........................................................................................10

*Steffel v. Thompson*,
   415 U.S. 452 (1974) .........................................................................................15

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ...........................................................................16

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ...........................................................................16

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981)............................................................................................7

*Wages & White Lion Invs., L.L.C. v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) ..........................................................................16

*Zinermon v. Burch*,
   494 U.S. 113 (1990)..........................................................................................12

## Constitutional Provisions

Tex. Const. art. XI, § 5..................................................................................................12

U.S. Const. amend. IV ...........................................................................................9, 10

## Statutes

10 U.S.C. § 18238..........................................................................................................7

10 U.S.C. § 2687(g)(1) ...................................................................................................2

TEX. CIV. PRAC. & REM. CODE §§ 66.001–.003 ...........................................................14

TEX. LOC. GOV'T CODE § 42.022(b)...............................................................................9

TEX. LOC. GOV'T CODE § 42.023 ..................................................................................14

TEX. LOC. GOV'T CODE § 42.101, et seq. ...............................................................1, 2, 13

TEX. LOC. GOV'T CODE § 43.0117 ..................................................................................2

TEX. LOC. GOV'T CODE § 437.002 ..................................................................................7

Tex. Loc. Gov't Code § 437.054 ....................................................................................7

## Rules

FED. R. CIV. P. 65...........................................................................................................17

W.D. Tex. Local Rule CV-7 ..........................................................................................17

## Other Authorities

Bill Analysis, Tex. S.B. 6, 85th Leg., R.S. (House Research Org. 2017)..........................3

Cassandra Pollock & Brandon Formby, *Texas Sen. Menendez Begins Filibuster of County Annexation Bill*, TEX. TRIBUNE (May 28, 2017) ...........................................................2

## INTRODUCTION

Plaintiffs Property Owners Withstanding ETJ Retractions ("POWER") and the Schoenstatt Movement of Austin ("Schoenstatt") (collectively, the "Property Owners") seek a preliminary injunction to enjoin the City of Austin (the "City") from exercising authority it does not have over properties that are not lawfully within its jurisdictional control.

Between 2023 and early 2026, the City released approximately 170 properties located within five miles of Bee Caves Armory from its extraterritorial jurisdiction ("ETJ"). Then, in March 2026, without any warning, the City declared the releases "void" and announced that the properties were instantly back within the City's ETJ and under its regulatory control. Indeed, the City immediately began issuing violation notices against properties it deemed noncompliant.

A preliminary injunction is necessary to prevent further irreparable harm from the City's unconstitutional interference with the Property Owners' ability to enjoy and use their land.

## FACTUAL BACKGROUND

### *The Texas Legislature gives property owners a path to municipal freedom.*

For most of Texas's history, ETJ control was a one-way ratchet: once land fell within a city's ETJ, the city held that regulatory authority, and the landowner had no meaningful recourse. That changed in 2023. Responding to widespread concern that municipalities were wielding ETJ authority as a tool of regulatory overreach, the Texas Legislature passed Senate Bill 2038.[1] Through S.B. 2038, the Legislature amended Chapter 42 of the Texas Local Government Code to create a statutory right for landowners to petition for automatic release from a municipality's ETJ.

---

[1] *See* Act of May 19, 2023, 88th Leg., R.S., 2023 Tex. Sess. Law Serv. ("S.B. 2038") (codified at TEX. LOC. GOV'T CODE §§ 42.101—.105 (Subchapter D)).

1

If the statutory conditions are met, "the municipality shall immediately release the area from the municipality's extraterritorial jurisdiction," and if the municipality fails to act within 45 days, "the area is released by operation of law." TEX. LOC. GOV'T CODE § 42.105(c)–(d).

Eligibility to petition for release is generally straightforward: be a resident or owner of a majority in value of an area that you wish to remove from an ETJ. *See* TEX. LOC. GOV'T CODE § 42.102. There are, however, narrow exceptions to this right. Relevant here, § 42.101(1) provides that a property is not entitled to rely on Chapter 42's automatic-release process if it is "within five miles of the boundary of a military base, as defined by Section 43.0117, at which an active training program is conducted" (the "Military Base Exception").

Section 43.0117 defines "military base" to mean "a presently functioning federally owned or operated military installation or facility." Texas law does not define "military installation," but federal law does. Under federal law, the term "military installation" refers to "a base, camp, post, station, yard, center, homeport facility for any ship, or other activity *under the jurisdiction of the Department of Defense*, including any leased facility." 10 U.S.C. § 2687(g)(1) (emphasis added).

This definition makes sense in the context of the Military Base Exception. As the legislative history shows, the exception was not drafted in a vacuum. In the 1980s, the federal government revived its Base Realignment and Closure ("BRAC") process to close and realign military installations across the country, including in Texas. Cognizant of that history, lawmakers filibustered an early version of the bill to demand the Military Base Exception, warning that land "developed improperly near military bases" "could heighten their chances of being shuttered in case the federal government undertakes another [BRAC] process." Cassandra Pollock & Brandon Formby, *Texas Sen. Menendez Begins Filibuster of County Annexation Bill*, TEX. TRIBUNE (May 28,

2017); *see also* Bill Analysis, Tex. S.B. 6, 85th Leg., R.S. (House Research Org. 2017) (warning unrestricted ETJ removals "could put military bases at risk of closure" because "[o]ne of the major considerations during the [BRAC] process is compatible land uses near bases").

The Military Base Exception was thus born of a single, narrow concern: keeping Texas's federal military bases off the BRAC list by preserving compatible land uses around them.

### *The Property Owners petitioned for, and the City granted, their releases from the City's ETJ.*

The Property Owners are among hundreds of individuals and entities who petitioned for release from the City's ETJ under Chapter 42. After reviewing each of the Property Owners' petitions, the City issued a letter confirming that the petition met the statutory requirements and that the property would be formally released from the City's ETJ as determined by § 42.105(d)— *i.e.*, 45 days after the petition was filed. *See* Gervasi Decl. ¶ 3 & Ex. A.

Since September 2023, approximately 170 properties located within five miles of Bee Caves Armory—a small Texas Army National Guard facility located west of the City—have been released from the City's ETJ through this process (the "Released Properties"). *See id.* ¶ 4. In other words, on approximately 170 occasions, the City determined that properties within five miles of Bee Caves Armory were not excepted from eligibility and, necessarily, that the Armory is not a "military base," as that term is used in the statute.

### *The City attempts to void the releases and reassert jurisdiction.*

Following the City's review of the Property Owners' petitions, each property was conclusively released from the City's ETJ and brought under the exclusive regulatory authority of Travis County. *See* Ford Decl. ¶ 8. The Property Owners relied on the City's written confirmations. *Id.* ¶ 9. For periods ranging from months to nearly three years, they operated,

3

planned, invested, and contracted on the understanding that they were outside the City's ETJ. *Id.*

Then, in March 2026, without any warning, the City sent letters to the owners of the Released Properties, including the Property Owners, declaring that the releases "were issued in error and are void and of no force or effect." Gervasi Decl. ¶ 5–6 & Ex. B.

"Upon further review," the City claimed, it "determined that [each] property is located within five miles of the boundary of a military base, known as the Bee Caves Armory." *Id.* at Ex. B. Each letter announced that, therefore, the property "is not eligible for release from the City's ETJ" and "remains within the boundaries of the City's ETJ, and all applicable municipal authority, regulations, benefits, and obligations remain in effect" (the "March Retractions"). *Id.* The City offered no avenue for review or a hearing, informing affected property owners that "no administrative appeal process is available." *See id.* at ¶ 8 & Ex. C.

The March Retractions had immediate, concrete consequences. Upon sending the letters, the City also began posting notices of violation on properties that, moments before, had been outside its jurisdiction—demanding immediate compliance with the City's ETJ regulations at the risk of civil and criminal liability. *See id.* ¶ 8 & Ex. D.

Across the affected properties, expansion projects came to a halt due to City restrictions; developers and investors who have invested heavily in architectural plans, permitting, construction contracts, and building loans in reliance on being outside of the ETJ are at risk of losing hundreds of millions of dollars in hard costs; owners with pending sales face cancellation; and those desiring to sell have seen market values fall by approximately two-thirds. *See* Ford Decl. ¶¶ 9–10.

Most fundamentally, each of the Property Owners petitioned for release from the City's ETJ for a reason—to increase the enjoyment and use of their properties. The Property Owners are

not asking for lawlessness. They are willing to abide by the regulations imposed by Travis County and state law. They do not, however, want to be subjected to the restrictions of the City restrictions, in whose government they have no voting rights—no voice. *See* Ford Decl. ¶ 12.

Each Property Owner received written confirmation that their petition satisfied the statutory requirements, and each of their properties was released—some as long ago as late 2023 and early 2024. *See* Ford Decl. ¶ 8; Gervasi Decl. at Ex. A. Under the City's reassertion of ETJ authority, they are suddenly re-subjected to land-use restrictions they were guaranteed to be—and had for years been—free from. *Compare* Gervasi Decl. at Ex. A, *with id.* at Ex. B.

### *Schoenstatt's experience exemplifies the City's misconduct and its consequences.*

Schoenstatt is a nonprofit religious entity and the Austin chapter of an international movement of Catholics striving for the spiritual renewal of their faith. *See* Pinto Decl. ¶ 4. Its core mission is to provide a place of fellowship and worship, and its 2.5-acre campus, centered around the Marian Shrine of Our Lady of Schoenstatt, has become a place of pilgrimage for the Diocese of Austin and beyond. *Id.* ¶¶ 5–6. Visitors travel from all over to, among other things, attend Mass, participate in retreats, and reflect in Eucharistic adoration. *Id.* ¶ 7.

Over the years, Schoenstatt has outgrown its space. *Id.* ¶ 8. Due to space constraints, it currently holds Mass outdoors, and when faced with inclement weather, it is forced to turn parishioners away because its covered facilities can't hold the full congregation. *Id.* ¶ 9

This is a solvable problem for Schoenstatt. While its *developed* campus is only 2.5 acres, its property is 17.65 acres, which can be developed to accommodate Schoenstatt's growing community—just not within the City's ETJ. *Id.* ¶ 10–12. Because of the City's restrictions, such as impervious coverage limits, Schoenstatt cannot obtain the permits needed to develop. *Id.* ¶ 12.

Chapter 42 offered a solution. On July 2, 2024, Schoenstatt filed its petition for release, and on August 1, 2024, the City confirmed that the petition met the statutory requirements and that the property would "be formally released from the City of Austin's ETJ as determined by Texas Local Government Code Sec[.] 42.105(d)"—i.e., by operation of law on August 16, 2024. *Id.* ¶ 13–14 & Ex. A. Its property was then released. *Id.* ¶ 15.

Schoenstatt relied on its release. For instance, it hired a design and architectural firm, paid for conceptual drawings, and invested significant resources—both financial and volunteer hours— in an aggressive fundraising campaign for its development project. *Id.* ¶ 16.

Then came the City's retraction letter. *Id.* ¶ 17 & Ex. B. Because Schoenstatt cannot comply with the City's regulations, like its impervious ground coverage limitations, the City's reassertion of jurisdiction has brought its project to a standstill. *Id.* ¶¶ 12, 19. The City's retraction has left the movement in an indefinite purgatory where its parishioners, at best, attend Mass under the hot Texas sun and, at worst, are turned away when services cannot be held outdoors. *See id.* ¶¶ 9, 19. Schoenstatt simply cannot achieve its full religious purpose and service to the Austin diocese while the City's retraction remains in effect. *Id.* ¶ 20.

### *The Bee Caves Armory is not a "military base."*

The City's stated reason for the March Retractions is that the Released Properties are within five miles of Bee Caves Armory, which the City now claims is a "military base." It is not. As discussed, the Legislature passed the Military Base Exception to protect military bases from closure by the federal government, with the definition of "military base" relying on the term "military installation," which is only defined in federal law and refers to property controlled by the Department of Defense. *See supra* at 2–3.

Bee Caves Armory sits on federal land that is leased by the State of Texas for use as a Texas Army National Guard facility, operated by the State under the Governor and the Adjutant General. It is, therefore, not subject to the jurisdiction of the Department of Defense. *See* TEX. GOV'T CODE §§ 437.002, 437.054(a). As a Texas Army National Guard facility, the Department of Defense cannot close, realign, or withdraw units from Bee Caves Armory without the Governor's consent. *See* 10 U.S.C. § 18238. It is not subject to BRAC; it is not a "military installation or facility"; and, in turn, it is not a "military base." The City itself recognized as much when, over 2.5 years, it released approximately 170 properties within five miles of the Armory.

### LEGAL STANDARD

A preliminary injunction is warranted where the movant establishes: (1) a substantial likelihood of success; (2) a substantial threat of irreparable harm absent relief; (3) that the threatened injury outweighs any harm the injunction may cause; and (4) that the injunction will not disserve the public interest. *LIA Network v. City of Kerrville*, 163 F.4th 147, 161 (5th Cir. 2025).

The purpose of a preliminary injunction is to preserve the parties' relative positions pending trial. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Courts, therefore, "customarily grant[]" preliminary injunctions "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* A party seeking a preliminary injunction isn't required to prove its entire case; it must simply demonstrate a prima facie case. *Id.*; *see also Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). Where a lawsuit raises multiple claims, the party must only show a likelihood of success on one to warrant relief. *Santiago v. Noem*, 2025 WL 2606118, at *2 n.1 (W.D. Tex. Sept. 9, 2025).

**ARGUMENT**

The Property Owners have satisfied each of the elements to demonstrate that the City should be enjoined from enforcing its March Retractions pending resolution of this case.

## I.    The Property Owners are likely to succeed on the merits.

The City's March Retractions fault at the first step, before this Court ever needs to decide the meaning of "military base."[2] The City rescinded the Property Owners' releases without any notice or opportunity to be heard. But even if it had provided some modicum of due process, the City was still without authority to reassert jurisdiction.

### A.  The City deprived the Property Owners of procedural due process.

A prima facie procedural due process claim requires two showings: "(i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). The Property Owners have demonstrated both.

#### i.   The Property Owners were deprived of their protected interest in being outside the City's ETJ and free from the City's regulatory authority.

As the Supreme Court "made clear," "the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money," and liberty interests extend "beyond the sort of formal constraints imposed by the criminal process." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571–72 (1972). A protected property interest is a "legitimate claim of entitlement" drawn from "an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577. And a liberty interest includes the many rights protected by the Fourteenth

---

[2] Because of the nature of preliminary injunctions, this Motion focuses on the straightforward issues presented in Counts I (procedural due process) and V (*ultra vires*) of the Complaint, neither of which depends on or requires this Court to interpret the meaning of the Military Base Exception.

Amendment, including the right "generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Id.* at 573 (internal quotation omitted) .

The Property Owners' entitlement to be outside the City's ETJ and free from the City's land-use regulations is such a protected interest. It is (1) inherently related to their ownership of real property; (2) grounded in Texas law; and (3) secured by the City's own conduct.

*First, ownership.* A property interest does not have to be ownership in real property. But here, it is. The right to use and enjoy property lies at the very core of what "property" means. Under Texas law, property is "the unrestricted right of use, enjoyment and disposal of a thing." *In re Kelso*, 196 B.R. 363, 369 (Bankr. N.D. Tex. 1996); *see also Simi Inv. Co. v. Harris County*, 236 F.3d 240, 249–50 (5th Cir. 2000). The City's March Retractions interfered with this interest.[3]

*Second, Texas law.* Texas law gives a landowner a protected interest in remaining outside a municipality's extraterritorial jurisdiction. For properties like those owned by the Property Owners here—unincorporated land that was not part of any ETJ at the time of the City's actions— a municipality can *only* exert extraterritorial jurisdiction "if the owners of the area request [it.]" TEX. LOC. GOV'T CODE § 42.022(b). Irrespective of the City's view on whether the Released Properties *should* have been released, the fact remains that they were. *See Elliott v. City of College Station*, 717 S.W.3d 888, 896 (Tex. 2025) (holding that jurisdiction returns to the county upon release); *see also Bowlby v. City of Aberdeen*, 681 F.3d 215, 219–21 (5th Cir. 2012) (holding business owner had protected interest in permits even though the city claimed they were erroneously

---

[3] The Property Owners do not suggest that municipalities may never regulate land use. They certainly can. But because use and enjoyment of property is a protected interest, the municipality must provide some process before doing so. The process required before interference and the amount of interference that will be tolerated are separate from whether the regulation interferes with a protected interest. It certainly does.

issued). They were outside the ETJ, in unincorporated territory subject to the exclusive jurisdiction of Travis County, for, in many cases, *years*. And Texas law states that they are entitled to remain in that position unless the Property Owners ask the City to bring them back into the ETJ. This is a protected interest.

***Third, the City's actions.*** The City's release itself conferred a benefit on the Property Owners—exclusion from the City's regulatory authority—on which they were entitled to rely. As both federal and Texas courts have repeatedly recognized, a property interest exists where the plaintiff "has a legitimate claim of entitlement that is created, supported, or secured by rules or mutually explicit understandings." *City of Houston v. Carlson,* 393 S.W.3d 350, 357 (Tex. App. 2012); *see also Bowlby*, 681 F.3d at 219–20 (Government-conferred "[p]rivileges . . . qualify as property interests for purposes of procedural due process."); *Bell v. Burson*, 402 U.S. 535, 539 (1971) (finding protected interest in driver's license).[4]

Here, the City reviewed each petition, confirmed the release in writing, and the release took effect, returning regulatory authority over the land to Travis County. The Property Owners, in turn, relied on the release to make decisions about their property and business ventures. And they did so for *years* on the understanding that they were permanently outside the ETJ. That conferral created a protected interest, regardless of whether the City now believes it was incorrect to grant the release. *See Bowlby*, 681 F.3d at 219–21. This is particularly true in this case, where the release was intertwined with interests at the core of due process: the right to pursue a livelihood and worship. *See id.*  This is the heart of the Fourteenth Amendment's safeguards.

---

[4] *See also, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254 (1970) (welfare benefits); *Sherbert v. Verner*, 374 U.S. 398 (1963) (unemployment compensation); *Speiser v. Randall,* 357 U.S. 513 (1958) (tax exemption); *Slochower v. Board of Education*, 350 U.S. 551 (1956) (public employment).

### ii.    The Property Owners were not given notice or an opportunity to be heard.

The City deprived the Property Owners of their protected interest without due process. As the Supreme Court has emphasized, "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation omitted). And, absent an emergency, "a meaningful time" generally means "*before*" the deprivation has occurred. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (internal quotation omitted) (emphasis in original).

Here, the process the City afforded was none—neither before nor after the deprivation. It issued no notice of proposed action, gave no opportunity to appeal, declared that the Released Properties were immediately subject to the City's regulations, and promptly began posting notices of violation. The question, therefore, is whether the City's simultaneous notice (the letter) and deprivation (reassertion of jurisdiction) was "adequate" process when viewed against the *Mathews* factors: (1) the private interest affected by the action; (2) the risk of erroneous deprivation and value of additional safeguards; and (3) the government's interest. 424 U.S. at 335. It wasn't.

1. **The Private Interest** → Substantial. The Property Owners' interest in being outside the City's ETJ affects their business and religious operations and the most fundamental decisions they make about how to enjoy and use their property.

2. **The Risk** → High. As the Fifth Circuit has recognized, the failure to provide "*any* process" before revoking a protected interest "increases the risk of an erroneous deprivation, and means that any procedural safeguards would be highly valuable." *Bowlby*, 681 F.3d at 221. Indeed, the need for pre-deprivation process is exemplified in this case, where the underlying basis for the City's deprivation is in dispute.

3. **The Government's Interest** → Low. To be sure, the City has an interest in regulating land *properly* within its jurisdiction. It cannot, however, have any interest in exercising regulatory authority it does not have. Nor would any arguable interest be overly burdened by providing at least *some* pre-deprivation procedure. *See id.* The Released Properties were outside the City's ETJ for *years* without any harm befalling the City.

The March Retractions were a deliberate, institutional decision taken against roughly 170 properties and ratified by the City's policymakers. *See* Gervasi Decl. at Exs. D & E. The City had time to develop its plan of retraction. It, therefore, had time to provide pre-deprivation process. *See Zinermon v. Burch*, 494 U.S. 113, 136–39 (1990). That the City changed its mind about its previous determination does not justify denying due process; it is the very reason process was necessary. The Property Owners are likely to succeed on Count I of their Complaint.

## B.  The City issued the March Retractions without legal authority.

The Property Owners are also likely to prevail on their claim that the rescission was *ultra vires* (Count V). Simply: the law does not authorize a municipality to void a completed ETJ release.

### i.   Municipalities cannot undo completed ETJ releases.

Texas home-rule cities, like Austin, do not have unlimited power. They possess only "the powers not denied by the statute or the constitution so long as the City has incorporated those powers in its charter." *City of Corpus Christi v. Unitarian Church of Corpus Christi*, 436 S.W.2d 923, 927 (Tex. Civ. App. 1968). A city may not act in a manner inconsistent with state law. *See* Tex. Const. art. XI, § 5; *City of Laredo v. Laredo Merchants Ass'n*, 550 S.W.3d 586, 593 (Tex. 2018). Nor may a city exercise power beyond its boundaries "without plain manifestation of legislative intent." *Ex parte Ernest*, 136 S.W.2d 595, 597 (Tex. Crim. App. 1939).

Chapter 42 of the Texas Local Government Code prescribes how ETJ releases—and ETJ annexations—take effect. Nothing in Chapter 42 authorizes a municipality to reconsider, revisit, rescind, or void a completed release. Indeed, the Supreme Court of Texas recently affirmed that "[w]hen property is released from a municipality's ETJ—by the city or by operation of law— regulation of the area is necessarily returned to the county." *Elliott*, 717 S.W.3d at 896 . The City

has identified no statute, ordinance, or provision in its charter authorizing it to reassert jurisdiction it relinquished (even if it believes the release was done in error). Because none exists.

The City's March Retractions—effectuated through its City Manager, T.C. Broadnax and/or its Director of Development Services, Keith Mars—were taken without legal authority. They are *ultra vires* and unenforceable. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372–73 (Tex. 2009). The Property Owners are, therefore, substantially likely to prevail on Count V.

### ii.  Any erroneous release would be void*able*, not void.

The City will likely fall back on the justification it gave in its retraction letters:

> Section 42.101(1) of the Texas Local Government Code states that a property located within five miles of the boundary of a military base is not eligible for release from a municipality's extraterritorial jurisdiction. Upon further review, the City determined that the property is located **within five miles of the boundary of a military base**, known as the Bee Caves Armory.

Gervasi Decl. at Ex. B. That argument will prove too much. Even assuming the City's newfound determination that Bee Caves Armory is a qualifying "military base" were accurate, § 42.101(1) does not state that properties located within five miles of a military base are ineligible for release. It provides only that "[t]his subchapter does not apply to" an area within five miles of a qualifying military base. TEX. LOC. GOV'T CODE § 42.101(1) (referring to Subchapter D).

In other words, the *right to automatic release* is not available to properties subject to the Military Base Exception. This subchapter does not, however, prohibit a municipality from releasing such property. Said another way, §§ 42.101–.105 prescribe when a municipality *shall* release an area; it does nothing to forbid a municipality from otherwise releasing an area even when it *wasn't required* to do so. The City had the power to release the Property Owners' land, irrespective of the Military Base Exception, *see, e.g.*, *id.* § 42.023, and it did.

These releases were, therefore, not void ab initio. At *most*, the releases would be void*able*. This is a distinction with difference. A "void" action is one taken wholly without authority (like the March Retractions). *See Alexander Oil Co. v. City of Seguin*, 825 S.W.2d 434, 438–39 (Tex. 1991). A "voidable" action is one taken with authority but allegedly defective in execution (like relying on the wrong statutory provision to release a property). *See id.*; *see also MC Trilogy Tex., LLC v. City of Heath*, 662 F. Supp. 3d 690, 700 (N.D. Tex. 2023) (distinguishing between void and voidable actions). Even if we pretend the Military Base Exception applies to these properties, the City's grant of release was an erroneous exercise of a power it possessed—void*able*, not void.

Voidable by whom? Not the City. Under settled Texas law, a voidable decision regarding a municipality's jurisdiction can only be challenged one way: through a quo warranto proceeding *brought by the State. See Alexander Oil Co.*, 825 S.W.2d at 436–38; *see also Fuller Springs v. State ex rel. City of Lufkin*, 513 S.W.2d 17, 19 (Tex. 1974); Tex. Civ. Prac. & Rem. Code §§ 66.001–.003.

The City did exactly what the law forbids. It made itself the judge of its releases, unilaterally declared them "void," and reasserted jurisdiction by fiat. That is ultra vires twice over: nothing in Chapter 42 or the City's charter empowered the City to rescind a completed release, and the authority to undo a voidable territorial-jurisdiction determination lies with the State—not with the City. The releases thus remain valid and in effect, and the City's reassertion of ETJ authority is unlawful. The Property Owners are substantially likely to succeed on their *ultra vires* claim.

## II.    The Property Owners will suffer irreparable harm absent an injunction.

Harm is "irreparable" for purposes of a preliminary injunction if there is "no adequate remedy at law." *Daniels Health Scis.,* 710 F.3d at 585 . To demonstrate irreparable harm, a "plaintiff need show only a significant threat of injury from the impending action, that the injury

is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). The Property Owners have made such a showing. Indeed, the harm has already begun and is ongoing. Injunctive relief is necessary to prevent *further* irreparable harm.

**First**, the Property Owners have been—and continue to be—deprived of due process, which is itself an irreparable harm that demands relief. As the Fifth Circuit has emphasized, "the loss of constitutional freedoms 'for even minimal periods of time[,] unquestionably constitutes irreparable injury.'" *BST Holdings, L.L.C. v. Occupational Safety & Health Admin*, 17 F.4th 604, 618 (5th Cir. 2021) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

**Second**, the Property Owners are at imminent risk that the City will take enforcement action against them for property uses or conditions that are compliant with Travis County's regulations, but not the City's. This is not a hypothetical—the City has already begun issuing violation notices. *See* Gervasi Decl. at Ex. C. Nothing can remedy the harm of being "between the Scylla" of civil and criminal penalties for noncompliance or "the Charybdis" of having to conform to regulations that are not lawfully imposed. *Steffel v. Thompson*, 415 U.S. 452, 462 (1974).

**Third**, monetary damages cannot remedy the City's interference with the Property Owners' use of their properties. The City's actions have halted significant, time-sensitive development projects and pending property transactions, "threatening the very existence of [the Property Owners'] businesses." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016). For Schoenstatt, the deprivation forces it to continue holding Mass outdoors and turn parishioners away, impairing the exercise of its religious mission. These injuries cannot be remedied by money damages. *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

15

**III.    The balance of equities favors an injunction in service of the public interest.**

"[W]hen the Government is the opposing party," consideration of the balance of equities and the public interest "merge." *Texas v. United States*, 809 F.3d 134, 187 n.204 (5th Cir. 2015), *as revised* (Nov. 25, 2015) (quoting *Nken*, 556 U.S. 418, 425 (2009)). In this case, an injunction would do no more than preserve the arrangement the City itself created and maintained for years— the Released Properties are released—serving the public's interest in preventing government overreach. As the Fifth Circuit has recognized, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (internal quotation omitted).

The City faces no cognizable harm from being held to the releases it granted. It collects no taxes from and provides no services to these extraterritorial properties, and it has no legitimate interest in exercising jurisdiction it relinquished. The Property Owners, by contrast, face accelerating harm to their properties, projects, transactions, businesses, and constitutional rights.

The balance of equities and public interest tips decidedly to the Property Owners.

*    *    *

Each of the preliminary injunction factors militates in favor of the Property Owners. The City, therefore, should be enjoined from enforcing the March Retractions pending final judgment.

UNOPPOSED REQUEST FOR EXPEDITED CONSIDERATION

Pursuant to Federal Rule of Civil Procedure 65, Local Rule CV-7, and the Court's inherent authority to manage its docket, the Property Owners respectfully ask the Court to consider this Motion on an expedited basis. Expedition is warranted because the harm is present and ongoing,

16

the Property Owners are exposed to escalating liability with each passing day, and the ordinary briefing period would allow that harm to compound before the Motion can be heard.

The undersigned counsel affirms that counsel for the Property Owners met and conferred with counsel for the City regarding this Motion on June 9 and June 11, 2026. During the June 11 conference, counsel for the parties agreed that an expedited schedule served the parties interests and specifically agreed that the City's response, if any, should be due on or before June 22, 2026, and that any reply by the Property Owners should be due within three days of the City's response.

Due to existing travel plans between July 2 and July 10, 2026, the parties additionally agreed that, if a hearing will be held on this Motion, they prefer it occur June 26, 29, or 30 or July 1, 2026, subject to the Court's availability.

Based on the foregoing, the Property Owners respectfully ask that the Court:

(1) set the City's deadline to file any response to this Motion as on or before June 22, 2026;

(2) require the Property Owners' to file any reply within three (3) days after the filing of any response by the City;

(3) set this Motion for hearing at the Court's earliest available date, preferably June 26, 29, or 30, or July 1; and

(4) rule on this Motion as promptly as practicable to prevent further irreparable harm.

The Property Owners are prepared to proceed on any schedule the Court sets and to provide any additional evidence or briefing the Court may require.

### CONCLUSION

For these reasons, the Property Owners respectfully request that the Court grant expedited consideration of this Motion and enter a preliminary injunction enjoining the City from enforcing the March Retractions during the pendency of this action.

Respectfully submitted,

/s/ Alexa L. Gervasi
Bill Cobb (TX Bar No. 00796372)
Alexa L. Gervasi (TX Bar No. 24147091)
**COBB & GERVASI, PLLC**
1250 S. Capital of Texas Hwy
Building 3, Suite 400
Austin, Texas 78746
(512) 955-5209
bill@cobbgervasi.com
alexa@cobbgervasi.com

*Counsel for Plaintiffs*

18

**CERTIFICATE OF CONFERENCE**

I certify that, in compliance with Local Rule CV-7(g), counsel for the Plaintiffs conferred with counsel for the Defendants regarding the relief requested in this Motion, including the request for expedited consideration, on June 9 and June 11, 2026. The Defendants oppose the request for a preliminary injunction, but counsel for both parties agreed to a proposed briefing schedule for this matter. Specifically, counsel agreed that: (1) the City's response, if any, should be due on or before June 22, 2026; (2) any reply by the Property Owners should be due within three days of the City's response; and (3) they prefer that any hearing on this matter occur June 26, 29, or 30 or July 1, 2026, subject to the Court's availability, due to existing travel plans.

/s/ Alexa L. Gervasi
Alexa L. Gervasi

**CERTIFICATE OF SERVICE**

I certify that on June 11, 2026, a true and correct copy of the foregoing was served on all counsel of record in accordance with the Federal Rules of Civil Procedure via the Court's electronic filing system and by electronic mail.

/s/ Alexa L. Gervasi
Alexa L. Gervasi

19